*281 Statement of the Case.
MONROE, .J.
The state alleges that it owns and is entitled to the possession of the Carondelet Canal and Bayou St. John and the Old Basin, situated in the parish of Orleans, together with all the property and improvements connected therewith or in any wise thereto belonging or appertaining.
“That defendant has been in possession of said property for many years, under certain legislative grants, agreeably to which its right to such possession has long since terminated, and that a board of control has been created, which is ready to take possession in its (the state’s) behalf, but that defendant refuses to turn over the property; that, in 1904, the New Orleans Terminal Company sought to expropriate a piece of land, in the form of a triangle, on which defendant's office was situated, and an agreement was entered into between the defendant, and said terminal company, and your petitioner, represented by the Governor, subject to the approval of the General Assembly, whereby the terminal company was allowed to take the property on paying $3,000, which amount was to be deposited in bank to await the determination of the question whether it should inure to petitioner or to defendant, and that said agreement having been ratified (by Act No. 77 of 1906), said amount is now on deposit accordingly.”
The prayer of the petition is that defendant be cited, through its liquidators, and that there be judgment decreeing:
“That the Carondelet Canal, the Bayou St. John, and the Old Basin, together with all the property and improvements connected therewith or thereto pertaining and belonging, including the aforesaid sum of $3,000, * * be delivered to * * * petitioner, to be managed and administered by it for the use of the public, through the board of control * * * appointed * * * under the provisions of Act No. 161 of 1906, and that the same be so delivered to your petitioner, free from any obligation on its part to pay or compensate”—
defendant, and that Act No. 74 of 1858, in so far as it may be regarded as requiring such compensation, be decreed void, as in violation of articles 108 and 109, of the Constitution of 1852, which prohibited the granting of state aid to corporations, save as therein provided; but, should the court conclude that some compensation is due defendant, that petitioner be nevertheless put in possession of the property, leaving the adjustment of the amount for further consideration. Petitioner further prays that defendant be ordered to render an account of its management since October 17, 1907 (that being the date at which its right of possession is said to have terminated), and that it have judgment for such amount as may be found due.
Defendant, by way of exception, denied the authority of the Attorney General to bring the suit, and objected that the state failed to set forth its title to the property claimed, which exceptions having been overruled, it answered by giving what purports to be a history of the property claimed, from 1794 to the present time, including a résumé of a vast deal of legislation, territorial, state, and federal, to which we will refer hereafter, and upon the basis of which, it alleges that:
The “state of Louisiana never at any time claimed any right, title, or ownership in or to the Canal Carondelet and the improvements thereon, made by the Orleans Navigation Company and its successors; and that, whatever rights the state has in and to this property are derived only from the contract rights existing between the Carondelet Canal & Navigation Company and the state of Louisiana, as defined by the Acts of 1857 and 1858, and * * * that said statutes * * * constitute a contract between the state * * * and the * * * company, protected from impairment by the Constitution of the United States, and that the state, * * * neither by suit nor otherwise, can * * * take the property of the' defendant in the said canal, basin, and Bayou St. John, without making to this defendant the compensation agreed to be made in said contracts. * * *. And further answering, defendant avers that it has always been ready and willing to comply with the provisions of the charter of 1857, .as amended by the charter of 1858, and is now ready and willing to deliver the Canal Carondelet and the basin and Bayou St. John to the state of Louisiana, upon the payment to it of the value of the property, .as fixed by an award of three commissioners, one appointed by the company, one by the Governor, and one by the civil district court for the parish of Orleans; and that until this award is made and the amount thereof paid it has the right to hold and enjoy the said property. * * * Further answering, defendant avers that the triangle mentioned in the plaintiff’s petition as having been sold, with reservation of the rights of the state, to the New Orleans Terminal Company, and the proceeds thereof (was and are) * * * part of its private property, not con *283 nected -with or making part in any respect of the said canal.”
From the evidence to which we are referred, we gather the following facts:
As originally laid .off, the city of New Orleans appears to have extended up and down the river for a distance of something less than a mile and to have extended back from the river for about half a mile. It was some six miles from the lake, which lies off to the north, and was separated therefrom by a swamp. In 1794, and before that time, the Bayou St. John flowed through the swamp, at a distance of, say, a mile and a half to the northwestward of the city ramparts, in the direction of the lake, into which it emptied its waters, and the then Spanish Governor, the Baron de Carondelet, caused a canal (since known as the Canal Carondelet) to be excavated from the bayou, with which it was connected, to a point just in the rear of the ramparts. Some years later, after the purchase of Louisana by the United States, the Legislative Council of the territory of Orleans, at its second session, established a corporation, with perpetual succession, called “the Orleans Navigation Company,” for the purpose of improving the inland navigation of the territory, and conferred upon it and its officers the right to enter upon all “lands covered with water,” with a view of laying out navigable canals, and to purchase, or expropriate, so much thereof as they might deem necessary for the purposes of such canals. The act seems to have been somewhat mutilated in the passage, for, without any. previous mention of the Bayou St. John or the Canal Carondelet, the ninth section reads, in part, as follows:
“Sec. 9. * * * That, as soon as the said company shall have improved the navigation of Bayou St. John so as to admit, at low ride, vessels drawing three feet of water, from Lake Pontchartrain, to the bridge at the settlement of the bayou, the said president and directors shall be entitled to ask * * * from every vessel passing in or out * * * a sum not exceeding one dollar for every ton,” etc.—
and the tolls were to be increased as the vessels drawing three feet were enabled to reach the basin, which was situated at the head of the canal as then constructed; further increased as they were enabled to get within, say, 100 yards of the river; and still further increased when they were enabled to reach the river. Section 13 of the act authorized the company to construct roads of shells, sand, or other hard material on either side of the bayou, and to charge tolls for the use of the same, and the last (seventeenth) section provided that the operations of the company should be confined “in the first instance” to the improvement of the inland navigation of the county of Orleans and of Bayou Plaquemine.” Acts 1805, c. 1. In 1809 the council passed an act providing “that the improvements of the Orleans Navigation Company shall not extend to the Bayou Plaquemine” (Acts of 1809, c. 22, p. 56); and in 1814 passed another act, confining the operations of the company “to the island of Orleans.” Acts of 1S14, p. 46. In the meanwhile, in 1811, a litigation had arisen between the company and the city of New Orleans upon the subject of the right of the latter to continue using the canal for drainage purposes, and the opinions of the three judges of the superior court of the territory, in which the matter was finally decided, as also the arguments of the counsel, throw a good deal of light upon the subject of the status of the canal and bayou, and of the relation of the company thereto. The first repiort of the case (Orleans Nav. Co. v. Mayer, etc., 1 Mart. [O. S.] 269) contains the following, among other, statements:
“This was an action brought to try the right of the corporation of the city of New Orleans to drain the waters of the city into the Bayou St. John, through the Canal Carondelet. * * * The negation company considered the canal as one of the navigable waters which their charter authorizes them to occupy and im *285 prove, under the idea that, whatever may have been the original destination of the canal, its last and permanent one was to be exclusively applied to the purpose of navigation.”
Mr. Livingston, representing the company, by way of argument said:
The publications of the Moniteur [referring to publications by which the then contemplated project of excavating the canal was announced, and which were accepted as coming from the Baron de Carondelet] clearly show that the primary object of the canal was navigation, although at first and until this end could be attained another was held out as an inducement to the people to send their negroes — the draining of the stagnating water from the back of the city. Both the objects could not be simultaneous, for one would necessarily prevent the other. The draining the waters and carrying off all the filth of the city into the canal must, in a very short time, fill it up and render it absolutely unfit for navigation. The paragraphs in the Moniteur, which are believed to be official, convey ideas that repel the presumption that the canal was intended to be a receptacle for the filth of the city. They speak of double rows of trees, affording an agreeable walk; of the satisfaction the people will have in beautiful shaded walks on each side of the canal. * * * There was, then, a time when the destination of the canal was to be altered, and, instead of being a canal d’egoutement, it was to become a canal of navigation.”
Mr. Moreau, on the other hand, said:
“The Canal Carondelet was dug at the expense of the inhabitants of New Orleans, with the aid of the chain negroes, granted to them by the King, on the representation of the Governor, whose name it bears; and we are informed from high authority that, if the expenses of the war had not forbidden it, an aid would have been obtained from the treasury. The papers in evidence clearly establish the proposition that the canal was built at the expense of the inhabitants, who spared their negroes, aided by the King’s grant of the chain negroes, at the instance and solicitation of his representative in the province.
“It was dug for a particular purpose, that of ridding the city of stagnating ponds, which contributed to its sickness, and the vast quantity of mosquitoes that rendered it unpleasant in summer, and the idea was held out that in successive years it might be changed into a canal for the navigation of schooners. Surely the city, from the moment the canal was dug, rightfully claimed the use of this canal, which it had acquired, partly for a valuable and partly for a good consideration.”
Judge Lewis and Judge Martin sitting together, the former was of opinion that the case was with the company, and' the latter that it was with the defendant, and there was no decision. It was then reargued (see 2 Mart. [O. S.] 10), and three paragraphs from the Moniteur, a paper admitted to have been “printed under the eye of the Baron de Carondelet,” and “allowed to be official,” were read in evidence. The first paragraph announces the project of a canal which will carry the stagnant waters into the Bayou St. John; states that, the war precluding the hope of aid from the royal treasury, the government (of the province) had only asked permission to use convict labor, whereby, “and the help of zealous inhabitants, to cut a drain, which in successive years will be changed into a canal for the navigation of schooners”; announces that, permission to use the convicts having been obtained, the government would ask the inhabitants of the city for the use of their negroes; and finally refers to two large banquettes which, when planted with rows of trees, “will afford an agreeable promenade.” The second paragraph (published in October, 1795) refers to the future greatness of the city, its increasing commerce, and the necessity of opening communication with the sea, through the lakes; presses the “commissaries” to prevail on the citizens to continue their aid; expresses the hope of the baron that, if the planters also assist, schooners will soon be able to come to the city; announces that a drawbridge is to be built over the bayou, at the expense of the city, and again mentions the projected promenade. The third paragraph (published in November, 1795) notices the completion of the “canal of the city” as far as the bayou, with a width of 15 feet, and mentions that it is being deepened, so as to enable schooners to come to the city. The court (Jurge Lewis, with Judge Matthews concurring) held that the canal was made for the twofold purpose of drainage and navigation; that the use which the city had had of it was merely a “permissive right, allowed by the sovereign, on account *287 of that portion of labor furnished by the inhabitants” of the city and country more immediately interested in its health and prosperity; and that its further use for drainage was no longer compatible with its use for navigation. The matter did not, however, end there, for Judge Martin wrote a strong dissenting opinion, in which, among other things, he said:
“The plaintiffs in this case are mere donees, or volunteers. They have paid no consideration. The defendants, on the contrary, if the judgment be against them, lose the whole labor and expense of digging the canal. I say the whole, because three fourths of the canal were dug by the personal labor of some of the inhabitants of the city and neighboring planters— the labor of their negroes, and with the money of others — and the other fourth, by the labor of the convicts which the sovereign bestowed as a favor. So says the baron. Now the right of the city in this last fourth is as strong as in the other three. Surely the sovereign, having-bestowed this gift, favor, or grace, could not fairly recall it. Although the city did not make any advances from the corporate chest, yet her rights are the same; for the canal was dug to avoid an expense the city would have been compelled to undergo, if her administrators respected the health and lives of her inhabitants. The very persons who furnished the aid directly would have been necessarily called upon to enable the corporate chest to perform the work. If a drain is now to be dug by the city, such of those persons who are still living, and the descendants of the others, must put their hands into their pockets, to do once more that which has already been done.” 2 Mart. (O. S.) p. 43.
And, as the law (Act of 1811, c. 6) required that a rehearing should be granted in all cases in which the court was divided, there was a reargument, upon which there was a final decision (2 Mart. [O. S.] 214), rendered by Judge Matthews, who held “that the primary object and ultimate end of all concerned in it was to make a canal of navigation” ; that it “could not answer the twofold use of a common sewer to the city and a navigable canal”; that there was no contract vesting in the city the right claimed by it (i. e., to drain into the canal). The case appears to have been pending from the spring term of 1811 to the spring term of 1812, and in the meanwhile, to wit, on July 8, 1811, there was passed a notarial act, upon Which the defendant now before the court seems to rely as showing title in it to some part of the property which is included in the present claim of the state, and which reads, in part, as follows (quoting from a translation which, with the French original, we find in the transcript):
“Before us, notary public, * * * appeared Mr. F. J. Le Breton Dorgenois; Chew & Rolf, under a power of attorney, from Mr. Daniel Clark; Domingo Fleitas; Dame Louise de la Ronde, Widow Castillon; and the free negress, Marie, represented by the said Mr. Le Breton Dorgenois; all owners of lands on the Bayou St. John, situated on the banks, and across the Canal Carondelet, and declared to me, by these presents, that they have given and granted in perpetuity, to the company of navigation, of New Orleans, * * * the full and entire power to enlarge the Canal Carondelet up to 25 feet, and to take, besides, on their px-operty, on each side, a road 60 feet in width, inasmuch as the said navigation company, for indemnity of said gift, * * * accords to them, as well as to their heirs and assigns, and forever (the right) to drain their waters into said Canal Cax-ondelet, by the ditches which they shall be able to conduct to it, and, thei-e, navigate, to reach their habitations in the city, so that no one, whosoever, by orders of the board of directors, can exact from them any payment, in this regard, at any time, * * * it being well understood that the above said land, transferred both for the enlargement of the canal, and road, to be established on the right and on the left of said canal, shall not be used for other purposes than those stipulated in the present act.”
We find in the record, as offered by defendant, a blueprint of what purports to have been a survey, made in 1871-72, “under contract of W. R. Ross and V. Sulakowski,” upon which appears the names of F. J. Le Breton Dorgenois, Daniel Clark, and Jean 'Baptiste Castillon, as the owners of certain tracts of land upon either side of the Canal Carondelet; and defendant has also offered excerpts from the American State Papers, showing confirmation of the grants to the parties above named, and to Charles Griffon, in which the lands granted are respectively described as follows:
“No. 376. Francis J. Le Breton Dorgenois claims a tract of land situated in the county of Orleans, on the left side of the Bayou St. John Road, containing two arpents in front and ex *289 tending back as far as within 60 feet of the Oanal Oarondelet, and bounded by the lands of Domingo Fleitas and Daniel Clark.”
“No. 126. Daniel Clark claims a tract of land, situate near the city of New Orleans, containing 12 arpents in front, on the road leading to Bayou St. John, and varying in depth; bounded on the north by the road aforesaid; on the south by the Canal Oarondelet; on the east by the land of Joseph Suarez; and on the west by the lands of Louis Blanc and the Bayou St. John aforesaid.”
“No. SOS. Jean Baptiste Castillon claims the following tracts of land situate in the county of Orleans, viz.: Sth. A tract situate on the left side of the Bayou St. John Road, in going from the city, containing six arpents in front, and extending back to the lands of Jean Gravier, and bounded on one side by the lands of Mr. Griffon and on the other by the lands of Mr. Oastenado. 9th. A tract of land situate on the Bayou St. John, containing 7SS superficial arpents, and bounded on one side by the lands ■of Mr. Beveiniseaux, and on the other by the lands of Metairie.”
“No. 151. Domingo Fleitas claims a tract of land, situate in the county of Orleans, at a distance of a mile from the city of New Orleans, containing 53 toises and one foot in front, on said road, and extending back as far as the land of Gravier, but varying in its width towards the rear, and bounded on the east by the land óf Madame Bertrand and vacant lands, and on the west by land of Joseph Suarez and vacant lands.”
(The title to the land thus described was, however, confirmed only as to “that part of this laud, viz., the front, and depth as far back as the letters A B on the plat executed by Charles Trudeau, late surveyor general, dated May 9, 1801;” the claim as to the rest having been rejected.)
“No. 351. Charles Griffon claims a tract of land situate in the county of Orleans, on the south side of Bayou St. John Road, at a distance of about ten arpents from the city of New •Orleans, containing two arpents in front, and extending in the depth as far as the lands of John Gravier,-and bounded on the northwest by lands of J. B. Castillon, and on the southeast by those of Olaude Treme and by lands claimed by the city as commons.”
The conveyance from the heirs of Griffon to the Orleans Navigation Company was made on January 16, 1828; the consideration recited in the act being $1,000, and the property conveyed being described as:
“All their right, title and claim which they or either of them have, has, or might have, or pretend, to a certain tract, or piece of land, situated and lying on both sides of the Canal Carondelet and bounded, on the south, or the side next to the city and basin, by the lands granted to General Lafayette, and, on the north, or the side next to the Bayou St. John, by the lands of M. Pontalba, the said tract, or piece, of land extending 60 feet from .the bank, or border, of the said canal, being the width of the roads on each side thereof. Making, together with the lands over which the said canal runs, and which is 30 feet wide, a total breadth of 150 feet, and extending, along the said canal, on both sides thereof, and parallel, or nearly parallel,, thereto, 395 feet, be the same more or less, the whole, conformable to the plan annexed to this act. * * * And it is hereby declared and agreed by and between all the said parties hereto that the said tract, or piece, of land is hereby conveyed and sold by the said vendors and purchased by the said company for the express purpose, following, viz.: That so much of the said tract, or piece, of land, herein and hereby conveyed, as lies on each side of the said canal shall be, and is, hereby, convenanted to bo used, forever, hereafter, as a public highway or road.”
There is also in evidence a copy of, or an excerpt from, the report of E. D. Saunders, special master, filed July 13, 1904, in the suit of George G. Wheelock et al. v. St. Louis & San Francisco R. Co. et al. (No written opinion), then pending in the Circuit Court of the United States for this district, which appears to have been an action brought by the minority stockholders of the Oarondelet Canal & Navigation Company (defendant herein), in which they complained that the majority stockholders, being also interested in the St. Louis & San Francisco R. Company, were preferring the interests of the railroad company to that of the canal company in the matter of a certain proceeding by the railroad company to expropriate certain property appurtenant to the Oarondelet Canal.
The report sustained the position of the majority stockholders of the canal company, with which their present position (as we assume that, though the company, by reason of the expiration of its charter, is in process of liquidation, the owners of the assets are those who owned the stock) is entirely at variance, and we make the following ex *291 cerpts therefrom, as being both interesting and valuable, in connection with the questions now under consideration, to wit:
“Built thus at the general charge, through public lands and for public purposes, the canal was, beyond any controversy, originally public property. * * *
“It would seem that the Baron de Carondelet, by some instrument which no longer exists and the exact terms of which have not been preserved, reserved over the public domain a strip of land from what is now the Old Basin to Bayou St. John, for a canal and for streets or roads along the canal. The evidence in the case above cited (Orleans Navigation Co. v. Mayor, 1 Mart. [O. S.] 274) speaks of 30 feet as the intended width of the canal, and also speaks of public roads, or promenades, being reserved along the canal. But the width of these roads is not mentioned. The defendant has offered in evidence copies of old deeds, grants, and confirmations of title to lands bounded by the canal reservation, which show that at various points on both sides of the canal the width of the strip reserved for a road, on each side, is always stated or assumed to be 60 feet from the water’s edge. Thus the confirmation by the land commissioner of the claim of F. G. L. Dorgenois, under occupation in 1803 (Am. St. Papers, vol. 11, p. 283), describes the tract confirmed as one fronting on the Bayou St. John Road and extending bacle as far as within 60 feet of the Gandí Garondelet. This would tend to show that probably in 1803 the roadway reserved along the canal was recognized as having a width of 60 feet. Again, in the suit of Fleitas v. Mayor, 1 Mart. (N. S.) 430, decided in 1823, the court says: ‘The petitioners claim title to a-tract of land, in the rear of the city of New Orleans, containing two acres front, on the space of 60 feet, reserved on the Canal Carondelet, by 18 in depth, by virtue of a grant to Carlos Guardiola, dated May 20, 1800.’ This claim was sustained by the court, thus recognizing a grant by the Spanish government, in 1800, in which the width of the reserved roadway is stated to be 60 feet. On February 23, 1820, the city purchased from B. McCarty a tract of land containing a little over eight arpents and fronting on the road along the Canal Carondelet. The description reads: ‘Une portion de terre située sur le bord du Canal Carondelet, et a la distance de 619 toises de l’alignment sud, est la rue Basin, la dite portion measurant 90 toises de face sur le chemin (qui) est 60 pieds de large dans toute la longear.”
“The relative ‘qui’ was evidently omitted through inadvertence in the above passage. Attached to the deed is a map which shows the line of the road, running parallel to the canal, from the Old Basin to the tract sold — nearly 1,300 yards. The scale on this map bears out the statement that the roadway along the canal is 60 feet wide in its entire length. The defendants have offered in evidence a copy of the patent by the Spanish government to Charles Guardiola, of date May 20, 1801, in which the tract conveyed is described as bounded by the reserved road, 60 feet wide, on the bank of the Canal Carondelet (indando este paño de tierra con el camino reservad de sesenta pies de ancho a la oeilla del Canal Carondelet). Assuming from the foregoing references that the width of the canal was intended to be 30 feet, and the width of the roadway was intended to be 60 feet, French measure, we should expect to find the property lines parallel to the canal 150 feet, French measure, apart. A number of them offered in evidence by defendants show, by the scales on them, that the distance between the property lines has always been regarded as 150 feet, French measure. Map of Joseph Pilie, city surveyor, dated January 25, 1826; plan of Surgi, deposited with O. H. Perry, N. P., on April 20, 1S50; plan of Joseph Pilie, April 14, 1829. The city has widened the street on the south side for some distance, and allowing for this increased width the original distance between the property lines would be approximately 150 feet, French measure.
“Another reason for believing that the width of the roadway along the canal was 60 feet is that the act of Congress of March 3, 1807, c. 36, 2 Stat. 440, confirming the claims of New Orleans to certain commons, makes it a condition of the confirmation that the city shall reserve from the lands so confirmed a strip for the continuation of the canal from the Old Basin to the river, and shall reserve a public highway on each side of the continued canal. The width of the highways reserved in this act of Congress was, no doubt, the same as that of the highways bordering on the canal up to the basin. Accordingly I find:
“(a) That the exact terms of the order of the Baron de Carondelet, dedicating or reserving a strip of land for the canal from the Old Basin to Bayou St. John, are not known.
“(b) That it seems morally certain from the references in old deeds, grants, old maps, decisions, and confirmations that the reservation was (1) 30 feet for the canal; (2) 60 feet on each side for a public road.
“(c) That the said strip of 150 feet was reserved on public lands and for public purposes, and was public property.”
From a synopsis of the findings of the special master upon the whole case we make the following excerpts:
“(1) The complainant is a shareholder of the Carondelet Canal & Navigation Company. (2> The several natural persons named as defendants in the bill are officers and directors of that company. (3) The capital stock of the company is, apparently, composed of 2,140 shares. On December 31, 1902, Mr. L. S. Berg, purchased from Dr. George K. Pratt, for $75,000-cash, 1,183 shares, being a majority of the stock of said company. This stock still stands, in the name of L. S. Berg, or B. F. Yoakum, but the money to purchase it with was furnished by B. F. Yoakum, then president of the *293 St. Louis & San Francisco Railroad Company, and Mr. Berg swears that he believes that “the equitable interest” in said stock is in the St. Louis & San Francisco Railroad Company, and I therefore find that said company is the real owner of said stock. * * * Mr. L. S. Berg is the president of the New Orleans Terminal Company, which is owned by the St. Louis & San Francisco Railroad Company and by the Southern Railway Company. * * *
“(4) The St. Louis & San Francisco Railroad Company and the Southern Railway Company own the New Orleans Terminal Company, and the city of New Orleans * * * granted the last-named company a right of entrance into the city, through Toulouse street, or Carondelet Walk, the street adjacent and parallel to the canal on the south side. (5) I find, and the defendants all admit, that when the railroad companies had purchased a majority of the stock of the canal company and had then elected a board of directors, consisting of such persons as they saw fit to nominate and elect, the board of directors, so elected, owed it to the minority to act with scrupulous care to assert all the rights of the canal company, as against the railroad company, in respect to the streets in which 'both companies had, or asserted they had, rights. And the action of the board, in respect of such possibly conflicting rights, must be closely scrutinized. But this duty of the board did not render it obligatory upon said board to assert rights which the minority believed the canal company had, but which that company did not in fact have. The test of the good faith and diligence of the board in the discharge of its duties is furnished by the charter, and not by the beliefs of the minority. And the board would not have been justified in engaging in litigation to assert rights for the canal company which it was not really entitled to. * * * (6) The Carondelet Canal & Navigation Company does not own, and has no right of control over the streets which adjoin, and run parallel to, the canal. (7) The chatter of said canal company expires' on March 10, 1908. (8) Under its charter provisions, the only rights granted to the canal company, with respect to the streets adjoining and parallel to' the canal, were: (1) To take ground therein for layouts, half moons, and basins, when needed for the commerce of the canal; (2) to build a railroad therein. • * * (13) I find that the charge that the board of directors contrived and intended to sacrifice valuable rights of the canal company to the railroad companies is not proven. The directors have sworn that they acted in good faith, and I have no doubt that they did. The charge is based principally on the supposition, positively averred as a fact in the bill, that he canal company owned the street along the anal, or had valuable and exclusive rights herein. I think that the directors have taken he correct view of the nature and extent of he rights of the canal company, and that the anal company would have gained nothing, and ill now gain nothing, by asserting that it ad such rights as the bill herein avers it has.”
In addition to the view thus presented, it may be added that the maps of the city of New Orleans show that the Canal Carondelet is bordered by public streets, and the decisions of this court show that almost from time immemorial the city of New Or- , leans has exercised jurisdiction over those streets, as over any other streets within its limits. Thus, in Cronan v. Municipality No. 1, 5 La. Ann. 537 (decided in 1850), the municipality was sued for the paving of Caron.delet Walk, and set up that the navigation j company was liable for part of the cost, as the owner of property fronting on the street paved, all of which the company denied. The court found that the question of the company’s ownership was expressly put at issue, and that there was no evidence in support of the allegations on that subject. The i demand against the company was therefore rejected. In Municipality No. 1 v. Kirk, 5 La. Ann. 34, it appeared that the defendant had been fined for landing a mast on the , northeast side of the canal, in violation of ¡ an ordinance assigning the southwest side | for the landing of such articles, and that he [1] set up the paramount right of the canal company to control the question, by virtue . of its title to the property. The court said that the proof of ownership was insufficient, but would not decide that question in the absence of the company, and affirmed the judgment imposing the fine, on the grounds that the power to regulate the public highways was unquestionably vested in the municipality, and the ordinance was not unconstitutional or illegal on its face. In 1821, the General Assembly adopted a resolution directing the Attorney General to proceed by scire facias, to inquire as to the validity of the charter of the Orleans Navigation Company, and whether, if constitutional, it had not been forfeited “by reason of the nonfeasance and malfeasance and the illegal and oppressive acting and doings of *295 said company” (see Acts 1821, p. 132), and the proceeding was instituted accordingly, and the result (a judgment for the defendant company), together with the arguments on behalf of the state and of the defendant, are duly reported. State v. Orleans Nav. Co., 11 Mart. (O. S.) 38, 323.
The learned counsel for the defendant, in the course of his argument in the case cited, said (page 143):
“The adverse party insists that the Bayou St. John is public property, free and common as a public highway for the use of all the people of the United States, and that, by this charter, it has been alienated in favor of the defendants, in violation of the Constitution and of all public rights. No such alienation of that stream, or of the use of it, has been made. It is still, and ever has been since the company has had the charge of improving it, a public highway, free for the use of all the citizens of the United States.”
In deciding the case, Judge Martin met the contention of the state that the right, granted to the compaqy to exact tolls for the navigation of the Bayou St. John, was unconstitutional and illegal in part by saying:
“The act of 1805 [referring to the act of Congress] extends, with some modification, the Ordinance of 1787 to the territory of Orleans. One of the provisions of the instrument is: ‘That all of the navigable waters leading into the St. Lawrence and the Mississippi, and the carrying places between the same, shall be common highways, and forever free, as well to the inhabitants of the territory as the citizens of the United States, or those of any other state that may be admitted into the confederacy, without any import tax or duty therefor.’ The counsel for the defendant has shown that neither the character of the public highway, nor its freedom, is ¡incompatible with its subjection to some rule. Freedom does not preclude the idea of subjection to law. Indeed, it presupposes the existence of some legislative provision, the observance of which insures freedom to us by securing the like observance from others. * * * The freedom stipulated for by the ordinance is not so absolute as to be inconsistent with submission to ferriage laws. * * * Nor with quarantine laws. * * * Nor with submission to pilotage laws. * * * Nor with submission to a law which provides a compensation for the labor and expense bestowed by an individual or corporation on the improvement of the navigation of a water course, attended before with difficulty and danger, to be paid by those who, by such means, navigate it with ease and safety. * * * It does not appear to us that there has been any alienation of the soil, nor that the bayou has ceased to be a public highway.”
In the course of the trial of the case thus referred t'o, a good deal of testimony was taken with regard to the navigability of the bayou, and the witnesses generally testified that, prior t'o the taking charge by the Orleans Navigation Company, there had been a bar off the mouth of the bayou, and another within the bayou, near the entrance thereto of a millrace; that on the (outside) bar there was, at low tide, not more than from 8 to 18 inches of water, with from 4 to 4% feet at high tide; that the condition depended upon the direction of the wind; that vessels were sometimes delayed for days, and even weeks; that it was quite common for them to lighter their cargoes over the (outside) bar; that there were persons at Ft. St. John who kept flat boats for hire for that service; and that upon occasion cargoes were jettisoned. In other words, that the navigation was accompanied with difficulties and at times with danger. With all that, however, it was admitted that commerce was and had always been carried on, and there were at all times from 30 to 50 schooners and smaller craft running in and out of the bayou from and to the north side of the lake, Bay St. Louis, Mobile, Pensacola, Appalachicola, and other ports and places. Counsel for defendant say, in their brief, “The Bayou St. John was at that time [when the Baron de Carondelet caused the canal t'o be dug] a nonnavigable stream, except for skiffs and pirogues,” and he mentions the names of some of the witnesses, to whose testimony we have referred, as supporting that statement. Bearing in mind that the testimony was given- in 1821, we shall consider it somewhat more particularly. Jose Pycharae (bridgekeeper for the company) testified that he had lived in the country for 40 years; that during the Span *297 ish régime be was employed as a pilot for tbe King, on tbe waters of tbe Bayou St. John and tbe lakes. He then testifies as t'o tbe difficulties of navigation, and, giving tbe bayou a rather bad name, says that the condition was unimproved until tbe navigation company took charge. ’On cross-examination be says:
“In the 'Spanish time, deponent, himself, and other schooners [?] sailed up to Carondelet’s basin, but with much labor. There might be about 50 vessels, including the trade of Pensacola, coming into the bayou, and none of them above the burden of 20 tons, and they all were obliged to unload, even to their cables and anchors, as well to pass the bar as to pass Maxent’s Canal, and hardly one in the course of a year could reach the bridge without unloading, then only in extraordinary times. Defendant often saw, in the Spanish time, many sail vessels moored at the bridge at the same time. The expedition against Bowles was composed of vessels, navigating on the bayou, which carried the troops and were joined on the lakes and off Pensacola by the armed vessels. * * * They all took in the troops and provisions at the bridge. * * * (Principal re-examination resumed.) At the time of the taking possession of the country by the Americans, none of the bayou sail vessels could ascend the Canal Carondelet.”
Paul Lanusse, wbo bad been employed by tbe company, testified that in 1796 tbe bayou was “not greatly navigable”; that there were some small vessels at tbe basin, but in general vessels were compelled to unload before crossing the bar; but when tbe Americans took possession tbe canal and bayou could not be navigated by large vessels.
■On cross-examination, be admitted that be bad seen schooners at the bridge in 1804 and 1805, but said that in general only small schooners were navigating the bayou at that time.
Louis Blanc testified to having difficulty in getting bis schooners out of tbe bayou; said that be kept a flat at tbe bayou for the purpose of saving charges. He admitted that be saw small vessels at tbe bridge in 1804 and in 1805, “but not so many as at present”; “there were vessels which traded to Mobile, Bay St. Louis, Pensacola, Appalacbicola, and the other side of tbe lake, but these were few in number.”
Louis Allard testified that in 1800—
“the navigation of the bayou was very much obstructed by chicot, on which vessels often remained stuck fast, and was also often obstructed by fallen trees. * * * That in the ordinary times of low water there was about two feet and a half on this last [outside] bar.”
“Being asked [on cross-examination] if, at the formation of the navigation company, there were not a great many schooners which traded to the Bayou St. John from tbe other side of the lake and from other places, witness says that there were, that almost all the planters on the opposite side of the lake each had a schooner, and they had no other means of communicating with New Orleans and disposing of their produce. Witness thinks that the whole number of vessels trading at this time [referring to the time mentioned in the question] to the Bayou St. John, from Pensacola, Bay St. Louis, and the opposite side of the lake, might be 35, including five or six oyster boats; that the whole of these vessels generally loaded at the bayou bridge, or near it; that witness thinks that at that period there might be a vessel trading to the bayou of the size of 30 tons, but this was a rare occurrence, and a vessel of 20 to 25 tons was at that time esteemed a large vessel; that at this period vessels were constructed with fiat bottoms to draw little water; that at this time vessels of the size usually navigating the bayou, and belonging to the King of Spain, arrived at the bayou bridge: witness knows that one vessel was built at the bayou bridge, before the establishment of the navigation company, and others repaired and fitted out.”
Guillaume Benite—
“commanded a vessel on the bayou, for six years, about 37 years ago; * * * up to the period of the establishment of the navigation company the navigation * * * was in a melancholy state, and not at all so navigable as at present; * * * that at the time of the cession * * * the Canal Carondelet was not at all navigable, even for pirogues,” etc.
On cross-examination:
“That the vessel formerly employed by M. Rillieux carried 200 barrels; that, in the year 1805, there might be about 20 vessels employed in the trade, on the lake and to Mobile and to other places; that the whole of those vessels, when the water allowed them, discharged at the bayou bridge; that some were obliged to remain outside the bayou bar and discharge their cargoes.”
James Pitot arrived in this country about' 25 years before testifying; was the first president of the navigation company; came *299 from Pensacola in a vessel of 18 to 20 t'ons; arrived off the mouth of the bayou and could not cross the bar; was landed in a pirogue. On cross-examination:
“Witness being asked whether, before the establishment of the company, vessels did not trade from the Bayou St. John, says that he has seen vessels at the bayou bridge; those vessels, when they could get over the obstruction to the navigation, went up to the bridge and unloaded. Witness supposes there were other vessels, besides the one freighted by him, trading from Pensacola to the bayou.”
Joseph Ravassa, in employ of the navigation company, testified that the condition of the bayou was bad before the company was established; “that vessels employed in the navigation of the bayou were at this time [meaning that time] obliged to hire Chalons [flats, or lighters] almost every trip.” On cross-examination he said:
“That rigged vessels came and anchored at the Bayou St. John, previous to the cession of this country to the United States. Witness supposes that those vessels might be from 20 to 30 in numbers; * * * that in high water all the vessels came up to the bridge and unloaded their cargoes, and in low water, after unloading into the chalons and taking it in again, then after passing the last bar took it in again and unloaded at the bridge; that for one that passed without unloading before arriving at the bridge, three had to unload, before arriving at the bridge.”
J. H. Holland testified that in 1802 the condition of the bayou was bad.
“That witness is satisfied that, from the state in which the navigation of the bayou and canal are now, as compared with what they formerly were, it would cost more to navigate it formerly [that is to say, before the improvements made by the navigation company] than it would do at present, paying the tolls of the company, and this besides the risk of lives.”
On cross-examination:
“That previous to the year 1805, there were several vessels as large as that of M. V. Rillieux, but she was one of the largest; that there was a vessel still larger, belonging to Mr. Parent, which witness has known to lie there three weeks before it could cross the bar; that the number of vessels, at this time [meaning that time] employed in the trade of the bayou was from 40 to 50, of which about 10 belonged to the lake and the remainder to Mobile, Pensacola, and other ports.”
All the witnesses above mentioned testified on behalf of the navigation company. Those who were called by the state were as follows:
Vincent Rillieux testified that the bayou and canal were navigable during the Spanish régime and also under the French.
“That during this period a schooner belonging to the father of the witness, drawing 3% feet of water, traded from the lake to the basin; witness thinks this schooner traded till the year 1802, or 1S03; witness knows that till the year 1806 the same schooner, when the water was high, could approach to within a little distance of the basin, to the half moon there; * * * that, previous to the erection of the navigation company, a considerable commerce was carried on, by way of the bayou and canal, with Pensacola, Bay St. Louis, Appalachicola, and the other side of the lake, and a considerable number of vessels, chiefly schooners, were employed in the trade.”
Alexis Rocbou testified that during the Spanish régime—
“in ordinary tides the depth of water [on the bar] was 3 feet, and in extraordinary 3%; that witness was employed 13 months during the above period in, a schooner belonging to Mr. Bonabel; that be traded in the lake and canal; that the schooner drew 5 feet water when loaded, and 2% when in ballast; that in high water the schooner could pass from the lake into the bayou, but at low water they were obliged to unload her before she could enter.”
On cross-examination:
“That the depth of the water on the bar, formerly was, at the lowest tides, one foot and a half; that loaded vessels were frequently required to unload their cargoes on the outside of the bar, in order to pass it; that at this time a Mr. Periquet, then commandant at the fort, and a Mr. Miguel, had a number of flats, which they kept for the purpose of hiring to discharge vessels wanting to pass the bar.”
Alexander Milne testified that, prior to the cession—
“a considerable number of small schooners and crafts navigated the bayou; that at low water it was difficult to get over the bar, but at high water they passed.”
Pierre Baam testified:
“That he commanded a schooner which traded in the bayou during the time of the Spanish government; that * * * the depth of water on the bar at the mouth of the bayou was, at the greatest height of water, four feet and a half, and the lowest one foot and a half; that *301 the schooner in which witness traded drew four feet and a half when loaded; that at the time the American government took possession of the country the vessel in which witness traded, which drew three feet and a half and four feet when loaded, always came to the basin to discharge.”
In 1847 the General Assembly directed the Attorney General to proceed against the Orleans Navigation Company for the forfeiture of its charter (see Act No. 244 of 1847, p. 202), and the suit was brought and resulted in a judgment decreeing the forfeiture, on the ground that the company had not complied with its obligations. The court, among other things, said:
“The navigation which, by the improvements of near half a century, should have attained all the perfection of which it is susceptible is obstructed so as to cause great expense and a delay of navigators by lightening; is dangerous, so as often to subject the vessels and commerce to much loss, for which there is no recourse, except as against an insolvent debtor. In fact, we doubt if the bar, at least, which affects the whole navigation, is in a better situation than in the time of Baron de Carondelet. So that, the whole object of the act of incorporation has failed.” State v. Orleans Nav. Co., 7 La. Ann. 681.
The judgment thus quoted was rendered in 1852, and during the same year the General Assembly, in anticipation of such a result, passed an act (No. 809 of 1852, p. 209) providing for the liquidation of the company and the sale of its property, and further providing as follows:
“Sec. 4. * * * That it shall be a condition of said sale, that, if the purchasers shall organize themselves into a corporation, under the law of the state, for a term of 25 years, for the purpose of carrying out and effecting all the improvements detailed and described in the report and plans known as Harrison’s report and plans, including the construction of a new basin at the junction of the Canal Carondelet and Bayou St. John, of the depth and dimensions set forth in said report, and shall actually complete and effect all said improvements within the term of three years from the date of this charter, then, the said corporation shall be entitled to receive and exact such tolls and revenues, for the use of said canal, bayou and road, as the Orleans Navigating Company was entitled to receive under its charter: Provided, that, at the end of said term of 25 years, the state of Louisiana shall have the right to take possession of said Canal Carondelet and Bayou St. John, and all the property and improvements connected therewith, at the expiration of the term above mentioned, should the Legislature determine so to do, upon paying to this corporation the value of said property, to be appraised by five competent persons, as experts, two, to be appointed by this corporation, and two, by the Governor, and the four, thus appointed, shall appoint the fifth. Said experts shall be required to take an oat'h to discharge their duty faithfully. In the event the state shall not determine to take possession of said property, as herein provided, then, this corporation shall be in existence for 25 years from and after the expiration of the term in this section mentioned aforesaid, and, at the end of said second term of 25 years, the said property may still become, absolutely, the property of the state of Louisiana, and no compensation required to be made to this corporation.”
Under the act thus quoted and the judgment of forfeiture, Jacob S. Halsey was appointed liquidator of the Orleans Navigation Company, and, by order of court, advertised for sale “all the rights, title, claims, and interests which belonged to the Orleans Navigation Company,” by virtue of the act of July 8, 1805, and “all the rights, title, claims, and interest belonging to said company by virtue” of the Acts of Congress approved March 3, 1S07, c. 36, 2 Stat. 440; February 10, 1809, e. 15, 2 Stat. 516; and April 18, 1814, c. 94, 6 Stat. Í44, as also several parcels of real estate. The sale took place on June 24, 1852, and the property was adjudicated to James Currie, to whom an act of sale was passed by Halsey, the liquidator, on June 28th following. Thereafter, on October 19, 1852, the New Orleans Canal & Navigation Company was incorporated (by a notarial act) for the purpose of “making improvements upon the Canal Carondelet and Bayou St. John, and for other purposes * * * in accordance with an act approved March 18, 1852 [Acts 1852, No. 309], and in accordance with the charter of the Orleans Navigation Company.” On October 26th following, certain persons, appearing as the principals of James Currie and as the owners of the property which had been adjudicated to him, conveyed the same to the *303 New Orleans Canal & Navigation Company thus organized, and that company possessed and administered it until 1857, when apparently it became unable to go on and to carry out the scheme of improvement for which it had been created.
By Act No. 160 of 1857, therefore, • the Carondelet Canal & Navigation Company was chartered, and (section 3) authorized'—
“ 'to enter upon and take possession and control of the Canal Carondelet and Bayou St. John, for the purpose of completing the works and improvements thereon, undertaken and commenced by the New Orleans Canal & Navigation Company,’ m pursuance of the provisions of the act of the Legislature of the state of Louisiana, entitled ‘An act relative to the Orleans Navigation Company, the Bayou St. John and Canal Carondelet, approved March 12, 1852;’ * * * provided, further, that the corporation hereby created may depart from the plan of improvement of said canal and bayou, to which reference is made in said act, designated as ‘Harrison’s plan,’ so far as said plan proposes_ a basin, at the junction of said canal with said bayou, and the construction of a breakwater at the mouth of said bayou, at Lake Pontchartrain, in case a majority of the board of directors should determine that such works are not demanded by the interest, safety, or convenience of commerce.”
The act further provides:
“Sec. 20. Be it further enacted, etc., that this corporation shall have existence for and during- the term of twenty-five years from and after the 17th day of October next; provided that the state of Louisiana shall have the right to take possession of said Canal Carondelet and Bayou -St. John and all the property and improvements connected therewith, at the expiration of the term above mentioned, should the Legislature determine so to do, upon paying to this corporation the value of said property, to be appraised by five competent persons, as experts, two, to be appointed by this corporation, and two, by the Governor, and the four, thus appointed, shall appoint a fifth; said experts shall be required to take an oath to discharge their duty faithfully. In the event that the state shall not determine to take possession of said property, as herein provided, then, this corporation shall be in existence for twenty-five years from and after the expiration of the term in this section mentioned aforesaid, and, at the end of such second term of twenty-five years, the said property'may still become absolutely the property of the state of Louisiana, and no compensation required to be made to this corporation.”
Thereafter, by Act No. 74 of 1858 (page 46), entitled “An act relative to the Carondelet Canal & Navigation Company,” it was provided:
“Sec. 1. * * * That the Carondelet & Navigation Company * * * shall have the right to construct lay-outs, basins and half moons, for steam and other crafts, at any point they may deem convenient, on the Bayou St. John, the basin and Canal Carondelet. and to extend the said lay-outs, basins and half moons on any part, or portion of the roads, streets, or neutral grounds through which run their navigable waters: Provided, they shall furnish the public with roads required by law, along and around such lay-outs, basins, and half moons, of the width as existing at the time of such extension, and keep the same, subject to the ordinances of the common council of New Orleans.”
Other sections of the act authorize the company to build a railroad, and for that purpose to expropriate property; prohibit the city, after five years, from draining into the Bayou St. John; confer upon the city the privilege of building bridges over the bayou; give the company the exclusive right to grant towing privileges on its waters; give the company the right to carry out its works according to any plan that it may adopt; authorize the directors to impose fines, for violation of its rules, “recoverable before any judge of competent jurisdiction”; authorize the company to issue bonds, and to secure the same by mortgage of all its property, privileges, and immunities; exempt the canal and railroad from taxation for 50 years. Section 4 of the act reads:
“Sec. 4. * * * That the said company shall enjoy corporate succession during fifty years from this date; after which time it may revert to the state, upon due compensation being made, according to award, by three commissioners, one appointed by the Governor of the state, one by the company, and the third by any court of record of New Orleans.”
The last section reads (section 10):
“That this act should be in force, from and after, its passage.”
And there is no repealing clause. The act was approved March 10, 1858. By Act No. *305 161 of 1906 (page 305), the General Assembly provides for the appointment of a board of control for the “Bayou St. John and Oanal Garondelet and basin,” invested it with the control of the property, and ordained certain rules for its management, the last section of the act providing that it “shall take effect on and after the first day of October, 1907,” and repealing all laws in conflict; and it appears that the board has been appointed. On March 10, 1908, the stockholders of the defendant company, in view of the expiration of its charter, selected three commissioners to liquidate its affairs. There was also appointed a commissioner to participate in the making of the award, as provided by section 4 of the act of 1858 (above quoted), and notice of the appointment was served on the Governor of the state, accompanied with a request that he take action with reference to the appointment of the other commissioners. The state, however, took no action in the matter until March 5, 1909, when the Attorney General made a written demand upon the liquidators of the company to turn over to the State Board of Control “the Bayou St. John and Garondelet Oanal and Old Basin, together with all the properties and improvements connected therewith or in any wise thereto belonging or appertaining.” To which demand the liquidators of the company, through their counsel, answered that they would comply “whenever the state complies with its contract obligations, * * * as declared in section 4 of Act No. 74 of 1858.” And shortly afterwards this suit was instituted. There was judgment herein in the district court holding that the three commissioners provided for by section 4 of Act No. 74 of 1858 must be appointed before any further proceedings can be had, and dismissing the suit “as premature, without prejudice to the rights of either party to question the ■eport and award of the said commissioners, y any process, when the -same shall have been made.” The state has appealed, and the defendant has answered, praying that the judgment be amended:
“First. By striking out all that part of the opinion of the court which holds that the state is entitled to take over, without compensation, such property as was held and owned by defendant company up to March 10, 1858, and that, for the property acquired and improvements made subsequent to the passage of Act No. 74 of 1858, the company is entitled to compensation according to the award of the three commissioners provided for in that act.
“Second. To enter a judgment rejecting the demand of the state, as made in the petition, with reservation of its right to take over the property and franchises of the defendant on an award made by the three commissioners provided for in said act of 1858. And, in all other respects, the defendant prays that said judgment may be affirmed, with costs.
Opinion — On the Exceptions.
[4] Defendant by exception (1) denied that the Attorney General is authorized to bring the suit, and (2) called upon plaintiff to deraign its title to the property sought to be recovered.
Act No. 65 of 1884, § 1, provides:
“That the Attorney General be, and he is hereby, authorized and empowered to institute and prosecute any and all suits he may deem necessary for the protection of the interests and rights of the state.”
R. S. § 131, makes it the duty of the Attorney General—
“when required by the Governor, or either branch of the Legislature, to appear for the state, in every court or tribunal, in any cases in which the state may be interested or may be a party.”
And it is shown that this suit was instituted and is prosecuted by direction of the Governor.
We know of no other sources from which the Attorney General could derive authority to bring a suit than the Legislature and the Governor, and no better language for conferring such authority than that by which the authority under which he is now acting has been conferred.
[5] 2. The defendant company was created by the state for the specific purpose of *307 assuming the management of the property described in the petition, and the statutory contract, outside of which it had no existence, and by virtue of which alone it came into possession of the property in question, requires it to account for its gestión. This suit is brought for the enforcement of that law and contract, and the defendant has no standing to call upon the state to exhibit or deraign any other title. The exceptions were therefore properly overruled.

 MONROE, LAND, and S'OMMERVILLE, JJ.